**VAS AERO SERVICES, LLC, Plaintiff,**

v.

**Phillip ARROYO, Defendant.**

**Case No. 12–CV–80484.**

United States District Court, S.D. Florida, West Palm Beach Division.

May 18, 2012.

to work for GA Telesis, LLC, one of VAS's biggest competitors, Arroyo improperly removed VAS documents containing confidential and proprietary information.

## A. VAS

VAS is a Delaware limited liability company with its principal place of business and headquarters located in Boca Raton, Florida. (*Id.* at ¶¶ 2–3). VAS is a "leading provider of aftermarket services in the aviation industry." (*Id.* at ¶ 6). Specifically, VAS sources, warehouses, and markets aircraft components to a diverse clientele. (*Id.* at ¶ 6).

VAS has been in business for over thirty years, and, during that time, VAS credits its success to its ability to "develop[ ] unparalleled sourcing and customer relationships with industry leaders, including, [t]he Boeing Company, General Electric, and Embraer." (*Id.* at ¶ 7). Additionally, VAS "is a preferred supplier to leading airlines worldwide." (*Id.* at ¶ 7).

One key aspect of VAS's business model is its redistribution program (*id.* at ¶ 8), which VAS created to benefit its existing clientele. Essentially, the redistribution program operates in the following manner: VAS's clients consign to VAS their excess aircrafts and parts, then, VAS strips the aircrafts and sells the parts. (*Id.* at ¶¶ 8–9). VAS arranges and executes the entire redistribution process from start to finish. (*Id.* at ¶ 9). In order to find suitable buyers, VAS utilizes its "proprietary based models to analyze [existing companies'] supply and demand" of the specific materials. (*Id.* at ¶ 8). Once the models determine which companies may need the specific materials, VAS's redistribution team forecasts what price would be appropriate for the product and then they market the products to target companies. (*Id.* at ¶ 8).

Andrew Michael Loewenstein, Akerman Senterfitt, West Palm Beach, FL, Christopher Stephen Carver, Akerman Senterfitt, Miami, FL, Jason Samuel Oletsky, Akerman Senterfitt, Ft. Lauderdale, FL, for Plaintiff.

Jonathan Vine, Cole, Scott & Kissane, P.A., West Palm Beach, FL, for Defendant.

## *ORDER ON PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND FOR PRELIMINARY INJUNCTION*

DONALD M. MIDDLEBROOKS, District Judge.

THIS CAUSE is before the Court upon Plaintiffs Motion for Temporary Restraining Order and for Preliminary Injunction ("Motion") (DE 4), filed May 2, 2012. On May 17, 2012, I held a hearing on the instant Motion. In addition to considering the evidence presented at the hearing, I have carefully reviewed Plaintiffs Motion, Defendant's Response, and am otherwise fully advised in the premises.

## I. FINDINGS OF FACT

On May 2, 2012, Plaintiff, VAS Aero Services, LLC, ("VAS") filed a Complaint seeking Injunctive Relief and Damages against its former employee, Defendant Phillip Arroyo ("Arroyo"). (*See* DE 1). VAS contends that before Arroyo left VAS

Since its inception, VAS has invested and continues to invest significant resources on the following: (1) collecting information and developing methods and techniques to help develop, maintain, and foster business relationships with business entities and (2) identifying a client's potential needs and developing innovative solutions to satisfy those needs. (*Id.* at ¶ 17).

### B. VAS and Boeing

While VAS invests substantial resources developing its relationships with all of its clients, VAS directs a significant portion of those resources towards fostering its relationship with one of its key clients, the Boeing Company ("Boeing"). (*Id.* at ¶ 10). On or around October 1, 2003, Boeing and VAS's predecessor, Volvo Aero Services Corp. ("Volvo"), entered into a Parts Distribution Agreement ("Master Agreement"). (*Id.* at ¶ 10). The Master Agreement sets forth the terms and conditions of the Parties' strategic business arrangement, for example, the Master Agreement provides that VAS would serve as Boeing's exclusive aftermarket service provider for "Boeing IDS aircraft parts." (*Id.* at ¶ 10).

The Master Agreement includes detailed provisions, including, but not limited to, delivery terms, pricing structures, warehousing and storage conditions, and profit allocation. (*Id.* at ¶ 11). Boeing and VAS have amended the Master Agreement by executing addendums that are incorporated by reference into the Master Agreement. (*Id.* at ¶ 11). VAS alleges the Master Agreement and addenda contain confidential, proprietary, and trade secret information, which is unavailable to the general public. (*Id.* at ¶ 14). Due to the type of information contained in the Master Agreement and addenda, VAS and Boeing incorporated a confiden-

tiality provision into the Master Agreement (*id.* at ¶ 11), which provides:

> Release of any information regarding this contract or performance hereunder shall not be made by one Party without prior written approval of the other Party. All proposed releases shall be submitted for written approval in accordance with Article 26, NOTICES. BOEING IDS Programs may not release information about other Programs internally within The Boeing Company or externally without the prior written consent of the Program.

(*Id.* at ¶ 15). Each addendum includes a similar confidentiality provision. (*Id.* at ¶ 16).

Before Boeing and VAS could finalize the Master Agreement and each subsequent addendum, they had to engage in "painstaking[ ] negotiations." (*Id.* at ¶ 12). During the hearing, VAS's General Counsel Kevin P. Hartney ("Hartney") testified that the Master Agreement and addenda include pricing terms, details about the stripping down process, and other confidential and proprietary information. Hartney stated that VAS invested and continues to invest significant resources developing its relationship with Boeing. One way VAS fosters its relationship with Boeing is by sharing "a common facility in Kent, Washington ("Kent Facility")." (*Id.* at ¶ 13).

### C. Security Measures

Due to the confidential and proprietary nature of the work performed at the Kent Facility, only an individual who has passed "multiple levels of security clearance" can enter the Kent Facility. (*Id.* at ¶ 13).

#### i. Master Agreement

In addition to the level of security clearance required to enter the Kent Facility,

VAS imposed additional security measures to protect the Master Agreement and addenda. (*Id.* at ¶ 14). As previously addressed, the Master Agreement and each addendum include a confidentiality provision, which requires VAS and Boeing to obtain the other party's written approval before releasing any information regarding the Master Agreement, an addendum, or performance of any of the acts set forth in the Master Agreement and addenda. (*Id.* at ¶¶ 15–16).

The Master Agreement and each addendum are stored in VAS's Program Management SharePoint database ("Management Database") and VAS's Legal SharePoint Database ("Legal Database"). (*Id.* at ¶¶ 23–24). In order to protect the confidentiality of this information, VAS installed a multi-tiered password system on its Management Database, which only permits a few "key VAS" employees to access these documents. (*Id.* at ¶ 23).

In a further effort to protect the information contained on both databases, VAS employees could only access these databases via VAS's intranet or through VAS's secured Virtual Private Network ("VPN") tunneling. (*Id.* at ¶ 25). Other security measures imposed by VAS to protect the information in its databases include, but are not limited to, the following: (1) permitting only key employees access to the databases; (2) requiring authorized users to change their "login credentials" every ninety days; and (3) mandating authorized users to select a password that is at least seven characters long and contains both letters and numbers. (*Id.* at ¶ 25).

### ii. Confidentiality Policy

In an effort to further protect any confidential and proprietary information, VAS requires its employees to agree to abide by VAS's confidentiality policy. Hartney testified that Arroyo acknowledged VAS's Company Information and Property Policy, when he electronically signed this document. The confidentiality policy provides in pertinent part:

> The protection of Company business information, property and all other Company assets are vital to the interests and success of the Company. No Company related information or property, including without limitation, documents, files, records, computer files, equipment, office supplies, or similar materials (except in the ordinary course of performing duties on behalf of the Company) may, therefore, be removed from the Company's premises. Violation of this policy is a serious offense and will result in appropriate disciplinary action, up to and including discharge.

> In addition, when an employee leaves the Company, the employee must return all Company related information and property that the employee has in his/her possession, including, without limitation, documents, files, records, manuals, information stored on a personal computer or on a computer disk, supplies, and equipment or office supplies.

(*Id.* at ¶ 33). In his Response, Arroyo concedes he currently possesses documents relating to VAS, in fact, he stated he "has offered to return and/or allow [VAS] to inspect any information or documents relating to VAS ... in his possession." (DE 21 at 15).

### iii. Confidential Nature of Work Policy

Additionally, VAS requires its employees to follow VAS's Confidential Nature of Work Policy, which provides in pertinent part:

> All records of the Company and information relating to the Company or its

customers are confidential and employees must, therefore, treat all matters accordingly. No Company or Company-related information, including without limitation, documents, notes, files, records, oral information, computer files or similar materials (except in the ordinary course of performing duties on behalf of the Company) may be removed from the Company's premises without permission from the Company. Additionally, the contents of the Company's records or information otherwise obtained in regard to business may not be disclosed to anyone, except where required for a business purpose. Employees must not disclose any confidential information, purposefully or inadvertently (through casual conversation), to any unauthorized person inside or outside the Company. Employees who are unsure about the confidential nature of specific information must ask their supervisor for clarification. Employees will be subject to appropriate disciplinary action, up to and including dismissal, for knowingly or unknowingly revealing information of a confidential nature . . .

The employee acknowledges that any disclosure of the Confidential Information, even inadvertent disclosure, would cause irreparable harm and material damage to the Company. While the Employee is employed by the Company (the "Employment"), and after termination of the Employment, for any reason, the employee agrees:

- Not to use or disclose the Confidential Information, other than solely in the furtherance of the Company's business

- To take lawful measures to prevent unauthorized use or disclosure of the Confidential Information to any third party

- To take lawful measure to prevent unauthorized persons or entities from obtaining or using the Confidential Information

- Not to take any actions that would constitute or facilitate the unauthorized use or disclosure of Confidential Information

(*Id.* at ¶ 34). Hartney testified that Arroyo also acknowledged VAS's Confidential Nature of Work Policy when he electronically signed this document.

### D. Arroyo's Employment at VAS

On December 13, 1999, Arroyo began working as the Regional Manager for Sales & Marketing for Jet Support, LLC ("Jet"). (*Id.* at ¶ 18). Jet was a wholly-owned subsidiary of VAS's predecessor The AGES Group, L.P. ("AGES"). (*Id.* at ¶ 18).[1] In early 2010, VAS approached Boeing about expanding their relationship into the military and defense industry. (*Id.* at ¶ 19). Essentially, VAS would use its existing redistribution program; however, after VAS completed tearing down Boeing's excess aircrafts, VAS would sell the materials to third-parties for military use. (*Id.* at ¶ 19). Due to the relationships Arroyo established with individuals at Boeing during his employment at VAS, VAS promoted Arroyo to Director of Sourcing of its new Military and Defense

---

**1.** In 2001, AGES changed its name to Volvo Aero Services, LP. (Hartney Decl. ¶ 7). On January 1, 2006, Volvo Aero Services, LP, filed a Certificate of Merger, which resulted in Volvo Aero Services LP merging into Volvo Aero North America, Inc. (Hartney Decl. ¶ 7). Once the merger occurred, the resulting company was called Volvo Aero Services Corp. (Hartney Decl. ¶ 7). On September 9, 2010, Volvo Aero Services Corp. converted from a corporation to a limited liability company; additionally, at that time, Volvo Aero Services Corp. changed its name to VAS Aero Services, LLC. (Hartney Decl. ¶ 7).

Division. (*Id.* at ¶ 20). As director, Arroyo's responsibilities included managing the Boeing–VAS programs. (*Id.* at ¶ 20).

By mid–2010, VAS's Military and Defense Division was operational, and, Boeing began consigning aircraft parts and aircrafts to VAS, so, VAS could strip the aircrafts and sell the parts to third-parties. (*Id.* at ¶ 21). In order to document each consignment, VAS and Boeing established a procedure to keep track of their transactions, which they memorialized in an addendum. (*Id.* at ¶ 21).

Due to his position as director, Arroyo served as the point of contact for the Boeing account. (*Id.* at ¶ 22). As the point of contact, Arroyo received and had access to both VAS's and Boeing's confidential, proprietary, and trade secret information; including, but not limited to, the Master Agreement and all addenda. (*Id.* at ¶ 22). Arroyo could access the aforementioned information because he possessed a security clearance, which permitted him access to restricted areas in the Kent Facility that contained this information; additionally, he could access both databases. (*Id.* at ¶¶ 22, 29).

It is undisputed that at the Arroyo began serving as director, he kept hardcopies of the Master Agreement, each addendum, and VAS's pricing and project specifications documents in a locked cabinet ("File Cabinet") in his office in the Kent Facility. (*Id.* at ¶ 29). However, Arroyo alleged "he purged" these documents "in or around late 2010 and early 2011 because these documents were contained on" the databases. (*See* DE 21 at 4).

### E. Arroyo's Actions At or Around the Time he Left VAS

#### 1. Termination of Employment

At 6:35 a.m. on Monday, March 19, 2012, Arroyo sent from his VAS e-mail address an e-mail to a substantial number of VAS's key client's informing them that later that day he intended to submit his two-week notice at VAS. (*Id.* at ¶ 36). In the e-mail, he stated he had "been given another great opportunity with another great and well establish [sic] company called: GA Telesis LLC [sic] in Ft. Lauderdale Florida [sic]." (*Id.* at ¶ 36). GA is one of VAS's biggest competitors.

In the e-mail he explained that he accepted a position as Vice–President at GA Telesis, LLC, ("GA"). (*Id.* at ¶ 36). As vice-president, he would manage GA's Military and Defense Division. (*Id.* at ¶ 36). Arroyo concluded his e-mail by inviting VAS's key clients to do business with him in the future at GA, and, stated that "[u]ntil such time when I can give you my new contact information [,] should you need me for any reason [,] please use the below [e-mail] as it is my personnel [sic] contact information. I will be asking VAS to let me stay on long enough to make sure all your questions and or [sic] concerns are answered, BUT we all know sometimes how that goes and sometimes it doesn't work the way we plan ..." (*Id.* at ¶ 36).

Upon receipt of the e-mail, several of VAS's clients forwarded the e-mail to VAS, and, VAS immediately terminated Arroyo's employment and security escorted him from the Kent Facility. (*Id.* at ¶ 39). Immediately after Arroyo's employment was terminated, VAS cut off Arroyo's access to VAS's databases. Additionally, VAS seized the lap top and phone it issued Arroyo and sent them to Stan Wilson ("Wilson"), a computer forensic investigator.

#### 2. USB Devices

For the purposes of this Order, I will solely focus on the following "suspicious

file activity" Wilson uncovered during his investigation (Decl. Wilson at ¶ 14): (1) on March 19, 2012, Arroyo copied a file named "Ake's E-mail address.msg" to a USB device, volume serial no. CC 8F 08 BC; (2) on March 14, 2012, Arroyo copied files named "Copy of Programs Sales Gross Profit Jan–March 122012.xlsx", "Parroyo MOU March 2012(2).doc", and "Parroyo MOU March 2012(2)rev 1.doc" to a USB device, volume serial no. 08 27 2E 67; (3) on March 1, 2012, Arroyo copied a file named "Middle River Surplus2.xls" to a USB device, volume serial no. CC 8F 08 BC; (4) on February 28, 2012, Arroyo copied a file named "FW IAS Inventory as of 02–09–12.msg" to a USB device, volume serial no. C8 3F 14 23; and (5) later on February 28, 2012, Arroyo copied additional files named "H46 PBL INV.xls", "767 Line Number 923 Dismantle Manufacturing and Tooling Description.doc", "OEM Master List.xlsx", and "LN 923 Disassembly Estimate–Draft11–28–11.doc" to a USB device, volume serial no. CC 8F 08 BC.

Several of the aforementioned files Arroyo copied include both Boeing and VAS confidential and proprietary information. For example, in the "LN 923 Disassembly Estimate–Draft 11–28–11.doc." VAS set forth all its disassembly time and cost estimates. Hartney testified that if a competitor of VAS could obtain this information, VAS could be outbid on current, as well as, future projects. Additionally, with respect to Boeing's tear downs, Boeing mandates VAS to keep this information confidential because the release of this information could pose risks to Boeing's business. At the hearing, VAS's counsel argued the most important document VAS needs returned is the "Copy of Programs Sales Gross Profit Jan–March 122012.-xlsx", which contains all of VAS's pricing information and margins.

### 3. E-mails

In addition to copying certain files to USB devices before his departure, Arroyo also sent e-mails outside VAS that contained confidential, proprietary, and trade secret information. Specifically, on or around February 29, 2012, Arroyo did the following: (1) forwarded copies of the Master Agreement and several addenda from his VAS e-mail to his personal e-mail account, phil.arroyo@comcast.net and (2) forwarded sales lead information to Ryan Heath, a former VAS employee who also left VAS to work for GA. (*Id.* at ¶ 46).

### 4. Removal of Boxes

Two days prior to his departure, Arroyo arrived at the Kent Facility at approximately 9:14 a.m. (*Id.* at ¶ 41). Another employee observed Arroyo moving boxes and, when he asked Arroyo what he was doing, Arroyo responded he was just "reorganizing his office." (*Id.* at ¶ 41). VAS argues he "was empting the File Cabinet and cleaning out his office." (*Id.* at ¶ 41). This belief is supported by VAS's security records, which indicate that from 12:05 p.m. until 12:14 p.m. Arroyo entered the Kent Facility at least six times. (*Id.* at ¶ 42). On one or more of these trips, VAS contends Arroyo removed the confidential and proprietary information Arroyo kept in the File Cabinet because the File Cabinet was empty after Arroyo departed on March 19, 2012. (*Id.* at ¶ 43).

### F. Events that Occurred After Arroyo Left VAS

#### 1. GA Press Release

Only three days after Arroyo left VAS, GA issued a press release announcing Arroyo would "head GA['s] ... Defense & Government Support Businesses" and "oversee the development and implementa-

tion of the business model and report [ ]to the Senior Vice President of Global Sales", Paul Lochab. (*Id.* at ¶ 55). In the press release, Arroyo is quoted as saying "GA ... has fast grown to the leadership position in the commercial aviation industry and I plan to take their commitment of service, quality[,] and reliability ... to a new industry sector that has long awaited a customer-tailored approach." (*Id.* at ¶ 55). Arroyo added "I am excited about the enthusiasm I am already receiving from the defense industry." (*Id.* at ¶ 55).

### 2. Demand Letter

On March 23, 2012, VAS sent a demand letter to Arroyo requesting him to return VAS's confidential, proprietary, and trade secret information. (*See* DE 1 at ¶ 56). The letter also instructed Arroyo to preserve any documents, whether electronic or hard-copy, that contained VAS's confidential, proprietary, and trade secret information. (*Id.* at ¶ 56). As of today, Arroyo has refused to return any of the information.

### 3. Instant Litigation

After Arroyo failed to return the documents, on May 2, 2012, VAS filed a Complaint against Arroyo alleging the following claims: (1) misappropriation of trade secrets; (2) breach of duty of loyalty; and (3) conversion.

## II. CONCLUSIONS OF LAW

"The grant or denial of a preliminary injunction is a decision within the discretion of the district court." *Carillon Imps., Ltd. v. Frank Pesce Int'l Group Ltd.,* 112 F.3d 1125, 1126 (11th Cir.1997). To obtain a preliminary injunction, the movant must show; (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunc-

tion issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the injunction, if issued, would not be adverse to the public interest. *See Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.,* 320 F.3d 1205, 1210 (11th Cir.2003) [hereinafter *Four Seasons* ]; *CBS Broadcasting, Inc. v. EchoStar Commun. Corp.,* 265 F.3d 1193, 1200 (11th Cir.2001); *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir.1998). "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to all four elements." *Davidoff & CIE, SA v. PLD Int'l Corp.,* 263 F.3d 1297, 1300 (11th Cir.2001) (quoting *Siegel v. LePore,* 234 F.3d 1163, 1176 (11th Cir.2000) (en banc)).

### A. Likelihood of Success on the Merits

In order to obtain a preliminary injunction, the first element VAS must prove is that there is a substantial likelihood that it will prevail on the merits of its claims against Arroyo at trial. *See Four Seasons,* 320 F.3d at 1210. VAS's probability of success on the merits depends on the validity of its misappropriation of trade secrets, breach of duty of loyalty, and conversion claims.

### 1. Misappropriation of Trade Secrets

In count one, VAS alleges Arroyo misappropriated trade secrets by removing hard copies of confidential and proprietary documents containing trade secrets from his office, downloading confidential and proprietary documents containing trade secrets from VAS's databases, and by emailing himself and another GA employee confidential and proprietary documents containing trade secrets.

VAS seeks both injunctive relief pursuant to section 688.003 of the Florida Uni-

form Trade Secrets Act ("UTSA"), and damages pursuant to section 688.004 of the UTSA. *See* DE 1 at 19–21; *see* Fl. Stat. §§ 688.001–688.009 (2011). Florida's UTSA "displaces tort law regarding trade secret misappropriation." *Del Monte Fresh Produce Co. v. Dole Food Co., Inc.,* 136 F.Supp.2d 1271, 1291 (S.D.Fla.2001) (citing *All Pro Sports Camp, Inc. v. Walt Disney Co.,* 727 So.2d 363, 367 (Fla. 5th DCA 1999)); *see also,* Fl. Stat. § 688.008 (2011) (Except as otherwise provided, Florida's UTSA "displace[s] conflicting tort, restitutory, and other law of this state providing civil remedies for misappropriation of a trade secret.").

To prevail on its claim for misappropriation of trade secret, VAS must demonstrate (1) that it possessed a trade secret and (2) that VAS's secret information was "misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it." *Del Monte Fresh Produce Co. v. Dole Food Co., Inc.,* 136 F.Supp.2d 1271, 1291 (S.D.Fla.2001) (quoting Fla. Stat. § 688.002(2) (2011)).

### i. Trade Secret

■ In order to be classified as a trade secret, the information at issue— which can include a formula, pattern, compilation, program, devices, method, technique, or process—must:

(a) [derive] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) [be] the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Fla. Stat. § 688.002(4) (2011); *see also Am. Red Cross v. Palm Beach Blood Bank,* 143 F.3d 1407, 1410 (11th Cir.1998) ("Under Florida law, a trade secret consists of information that (1) derives economic value from not being readily ascertainable by others and (2) is the subject of reasonable efforts to maintain its secrecy."). VAS bears the burden of establishing the information allegedly taken by Arroyo is a trade secret and that it took reasonable steps to protect the information. *Am. Red. Cross,* 143 F.3d at 1410 (citing *Lee v. Cercoa, Inc.,* 433 So.2d 1, 2 (Fla. 4th DCA 1983)). "Information that is commonly known in the industry and not unique to the allegedly injured party is not confidential and is not entitled to protection." *Autonation, Inc. v. O'Brien,* 347 F.Supp.2d 1299, 1304 (S.D.Fla.2004).

Here, VAS alleges that Arroyo misappropriated several files that include trade secrets. Specifically, VAS argues the following information constitutes a trade secret: (1) the Master Agreement; (2) all addenda; (3) the customer pricing, pricing arrangements, profit and margin information; (4) financial and business plan model information; (5) parts information and program requirements; (6) warehouse inventory documents; (7) open tenders; (8) Boeing Dismantle Manufacturing and Tooling Descriptions; (9) structural documents evidencing core terms and conditions between Boeing and VAS; and (10) lists of parts not yet awarded to VAS.

■ Except for the Master Agreement and the addenda (collectively, "the VAS–Boeing Agreements"), Arroyo's counsel, S. Jonathon Vine ("Vine"), did not dispute that the aforementioned documents are trade secrets. Vine argued the VAS–Boeing Agreements are not trade secrets because they do not derive independent economic value from not being generally known, the terms of the VAS–Boeing

Agreements are generally known, and Boeing and VAS did not make reasonable efforts to maintain the secrecy of the documents. As I indicated during the hearing, I find these arguments neither persuasive nor compelling.

The VAS–Boeing Agreements unquestionably derive independent economic value. Hartney testified that these documents include pricing formulas, pricing terms, and procedures for tear downs. Documents containing strategic marketing plans and pricing information have been held to constitute trade secrets under Florida law. *See, e.g., Sethscot Collection, Inc. v. Drbul,* 669 So.2d 1076, 1078 (Fla. 3d DCA 1996) (confidential active customer list that contained a detailed purchasing history for each entity qualified as a trade secret entitled to injunctive protection); *Thomas v. Alloy Fasteners, Inc.,* 664 So.2d 59, 60 (Fla. 5th DCA 1995) (holding that confidential order edit lists are trade secrets because they reveal appellee's pricing and profit structure). The value of the VAS–Boeing Agreements hinges on the fact that if disseminated, a competitor, like GA, could undercut VAS's prices. As Hartney stated during his direct examination, the release of this information would significantly impact VAS on current and future projects. Alternatively, VAS derives independent economic value from the VAS–Boeing Agreements not being generally known by its competitors because if a competitor obtained these documents, it could identify Boeing's needs without investing significant time and resources in establishing a relationship with Boeing. Finally, the VAS–Boeing Agreements derive independent economic value by not being generally known because they contain product specifications and VAS's unique procedure for tear downs. Specifically, Hartney represented the documents include specifications of Boeing airplanes, including, identification of the particular components of Boeing aircraft that are removed when a Boeing commercial aircraft is stripped and converted for military use. Aside from potential security concerns, Hartney represented Boeing expressly forbids the release of this information.

Vine's second and third arguments are equally unavailing and can be addressed together. VAS and Boeing each implemented substantial security procedures to protect the dissemination of this information, including, but not limited to: (1) installing multi-tiered password protections; (2) limiting access to the Kent Facility to individuals who obtained a security clearance; (3) only permitting a few key employees access to these documents; (4) only permitting access to the databases through VAS's intranet or through its VPN; (5) requiring individuals to have badges to enter the Kent Facility; and (6) mandating key employees who are authorized to view the VAS–Boeing Agreements to choose complex passwords, and, change those passwords every ninety (90) days. Furthermore, within each document VAS and Boeing included a non-disclosure provision that requires either party to obtain prior written approval before the information is released. In fact, the parties take the disclosure of this information so seriously that when Hartney discovered Arroyo emailed himself these documents, Hartney, on behalf of VAS, had to immediately disclose Arroyo's actions to Boeing executives at the Kent Facility and report the breach to Boeing's ethics division. Considering all the facts presented during the hearing, Vine's contention that this information is generally known because it can be accessed by employees outside VAS is nonsensical. As a party to the contract,

Boeing would have to permit certain Boeing employees to access the VAS–Boeing Agreements in order for Boeing to fulfill its contractual obligations, which are set forth in the VAS–Boeing Agreements. Furthermore, VAS required its employees to comply with its numerous confidentiality policies.

### ii. Misappropriation

Section 688.002(2) of the Florida Statutes defines misappropriation as:

(a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means . . .

Fla. Stat. § 688.002(2)(a). VAS established a substantial likelihood that it could prove at trial that Arroyo knowingly acquired VAS's trade secrets by improper means. After considering the docket and the evidence presented during the hearing, I find Arroyo's conduct highly suspect. Notably, Arroyo failed to attend the hearing. Due to his absence, the Court and the Parties had to turn to his pleadings and affidavits, which often conflicted and failed to address key allegations.

On Arroyo's behalf, Vine argued that VAS could not prove that Arroyo misappropriated any of VAS's trade secret information because any VAS documents he copied onto the USB devices between February 28, 2012, until March 19, 2012, was done for business purposes (*see* DE 21 at 11), he destroyed the hard copies of the Master Agreement and addenda in the File Cabinet around late 2010 and early 2011 (*see* DE 21 at 10), and he copied certain information because he was suspicious of John Brooks, a VAS employee, who he suspected of engaging in unethical behavior (*see* DE 21 at 13).

In support of his first argument, Arroyo stated he "used thumb drives to perform work functions from home and on the 'road' " (Decl. Arroyo at ¶ 18) because internet access is weak at his house (Decl. Arroyo at ¶ 19). Arroyo represented the practice of using thumb drives to transfer documents was not unusual. Indeed, he contends VAS customarily supplies thumb drives to its employees, other employees at VAS regularly use thumb drives, and his superiors authorized him to use thumb drives. (Decl. Arroyo at ¶¶ 20–21).

Arroyo's limited representations set forth in his declarations do not accord with the facts, and, quite frankly, do not make sense. Meghan Burgan ("Burgan"), VAS's Vice President of Business Processes and Technology, confirmed that the information Arroyo copied can only be obtained by key VAS employees who connect to VAS's databases either through the intranet or the secured VPN. (Decl. Burgan at ¶ 7). Since a VAS employee can access VAS's databases through the VPN, a VAS employee would generally not need to copy VAS's information to a thumb drive. I find it hard to believe that Arroyo, or another VAS employee, would go through the hassle of downloading VAS's confidential and proprietary information to a thumb drive, when he could access this information through the databases.

Assuming Arroyo could not access the internet at his house, this explanation does not justify why he would need to copy files to thumb drives when he was traveling on business. I am highly skeptical of Arroyo's statement that he could not access the internet from his home. During the hearing, Burgan testified that Arroyo never reported to anyone at VAS that he had issues connecting to the internet from his home. If he had complained, Burgan represented that VAS could have remedied the situation. If Arroyo could not access

the internet from his home, I do not understand why he would have (1) emailed the VAS–Boeing Agreements to his personal e-mail on February 29, 2012, and (2) provided his personal e-mail to VAS's key clients in the farewell letter he sent on March 19, 2012. Additionally, on March 18, 2012, prior to his departure from VAS, Arroyo exchanged text messages with Ray Reyes ("Reyes"), vice-president for Tech Ops for Ryan International Airlines. (*See* DE 1 at ¶ 53). While the content of the text messages is not pertinent to this Order, during the exchange, Arroyo asked Reyes to "send anything you have to my personnel [sic] email at home." (*Id.* at ¶ 53). One can infer that Reyes sent an email to Arroyo's personal account, and, Arroyo accessed the email, because Arroyo responded "Got it ... Send u specs and details ..." (*Id.* at ¶ 53).

None of VAS's witnesses echoed Arroyo's statement that VAS routinely distributed thumb drives to its employees or that other VAS employees commonly used thumb drives. In fact, another VAS employee, Heidi Nesper ("Nesper") testified that she only recalled VAS distributing thumb drives at trade shows. Moreover, Arroyo states his thumb drives bear "the logo of Volvo Aero ..., a predecessor to VAS ... as well as the logo of APO", which "is an online destination powered by VAS." (Decl. Arroyo at ¶ 21). The thumb drive bearing the name Volvo Aero could have been distributed to Arroyo as early as 2001 or as late as 2010 because this was the time period in which VAS was called Volvo Aero. I question the veracity of Arroyo's statements because if VAS routinely gave its employees thumb drives, one would assume that Arroyo would use a VAS thumb drive, as opposed to an older thumb drive provided by Volvo Aero or a thumb drive for an online parts outlet.

Moreover, a practice of distributing thumb drives to its employees and permitting its employees to copy confidential documents to thumb drives would directly contravene VAS's confidentiality policies and pose a serious risk that the information could be leaked.

Turning to Arroyo's apparent destruction of the proprietary and confidential information he kept in the File Cabinet, Arroyo argues he purged any hard copies of confidential or proprietary documents around late 2010 and early 2011. (*See* DE 21 at 10). Arroyo claims the only items he kept in the File Cabinet "in March 2012 were non[-]confidential and nominal value items such as industry reference guides, dictionaries, mugs, and personal materials accumulated through years working in the industry." (Decl. Arroyo at ¶ 15). Arroyo represents that after he "decided to take the job at GA Telesis, [he] cleaned out [his] office at VAS Aero." (Decl. Arroyo at ¶ 15).

Initially, I question whether an individual would keep non-confidential and nominal items, like a coffee mug, in a locked File Cabinet. Even if this were true, Arroyo claims he "put the items from the file cabinet ... in boxes and took" the boxes home. (Decl. Arroyo at ¶ 16). I find it difficult to believe that Arroyo would go travel to the Kent Facility at 9:14 a.m. on Saturday, March 17, 2012, which happens to be St. Patrick's Day, to remove non-confidential and nominal items from a locked File Cabinet. Arroyo had to be aware that very few people would be at the Kent Facility on St. Patrick's Day at 9:14 a.m. VAS's security records indicate that between 12:05 p.m. and 12:14 p.m., Arroyo made six trips in and out of the Kent Facility. On those trips Arroyo had the opportunity to remove a significant amount of material from the Kent Facility.

What draws the Court to further question Arroyo's statements is that he stated in his email to VAS's key clients on March 19, 2012, that he intended to put in his two weeks notice that day and that he would ask "VAS to let [him] stay on long enough to make sure all" his clients' questions were answered. (*See* DE 1 at ¶ 36). If Arroyo intended to stay for two additional weeks at VAS, he could have moved the nonconfidential and nominal items from his locked File Cabinet during that time.

Most troubling is Arroyo's statement that he "sent emails to [him]self and put documents on thumb drives to protect [him]self" because he suspected John Brooks, a VAS employee, of engaging in unethical behavior, namely, selling a Boeing part that was purchased in 2006 for $100, 00.00 for $1,600.00. (Decl. Arroyo at ¶ 28). In his Declaration from May 11, 2012, Arroyo stated he downloaded this information "to protect himself"; however, in his third declaration from May 16, 2012, Arroyo conveniently changed his story and stated that as a director of VAS he was responsible for investigating Boeing's complaint regarding the sale. (Decl. Arroyo at ¶ 10).

Hartney and VAS's attorney explained during the hearing that Arroyo was not involved in the investigation, the investigation was resolved, and Arroyo was notified that the investigation had resolved. The document that Arroyo copied on March 14, 2012, "Copy of Programmed Sales Gross Profit Jan–March 12, 2012.xlsx.", is according to Hartney and VAS's counsel, VAS's most confidential and proprietary document. (Decl. Hartney at ¶ 27). "This file contains up-to-date information on *every* VAS Aero program" and contains information on all of VAS's customers, including, but not limited to, the following: (1) VAS's total sales by geographic region; (2) VAS's gross margins by geographic region; (3) a list of every VAS program; (4) data about every VAS customer; and (5) a detailed breakdown of specific parts prices, sales data, margins, budget forecasts, repair percentages. (Decl. Hartney at ¶ 27). I find it highly suspect that Arroyo copied this information to a USB device on the same day GA sent him his employment contract. (*See* DE 1–Attachment 2 at 7). Furthermore, if Arroyo was already planning on leaving for GA, it would not make sense for him to be concerned that he could be blamed for an improper sale.

After considering the evidence, for the purposes of the instant Order, I find that VAS demonstrated it has a substantial likelihood of succeeding on the merits of its claim for misappropriation of a trade secret. Accordingly, unless VAS cannot satisfy the remaining three prongs of the preliminary injunction test, it is unnecessary to consider VAS's additional two counts.

### B. *Irreparable Injury Absent an Injunction*

█ The second factor the court must consider when evaluating a request for a preliminary injunction is whether there has been a showing of irreparable harm. This factor is "the *sine qua non* of injunctive relief." *Northeastern Florida Chapter v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir.1990) (quoting *Frejlach v. Butler*, 573 F.2d 1026, 1027 (8th Cir.1978)). An injury must be actual and imminent not remote or speculative. *Northeastern Florida Chapter v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir.1990). In order for an injury to be irreparable, it cannot be undone through monetary remedies. *Northeastern Florida Chapter v. City of*

*Jacksonville*, 896 F.2d 1283, 1285 (11th Cir.1990). If the information Arroyo purportedly has in his possession was disseminated to VAS's competitors, like GA, VAS would unquestionably suffer irreparable harm. VAS's reputation for maintaining its clients' confidentiality would be tarnished and VAS's competitors could underbid VAS.

Vine argued that VAS failed to establish irreparable injury because (1) Arroyo offered to return VAS's documents purportedly in his possession and (2) any harm that VAS may have sustained can be adequately remedied with other compensatory relief. I disagree. What documents Arroyo has in his possession is far from clear. What is clear is that Arroyo has several VAS documents in his possession that contain VAS's and its clients' trade secrets. When VAS sent Arroyo a demand letter on March 23, 2012, requesting Arroyo return these documents, he refused. Arroyo's current offer is insufficient to rebut VAS's showing that it would suffer irreparable injury.

Absent an injunction, GA will have a vice-president—Arroyo—who purportedly possesses VAS's and its clients' confidential information regarding contract structures, pricing points, marketing strategies, and customer management. The dissemination of this information could pose threats to both VAS's success and its clients' success. Accordingly, I find that VAS is likely to suffer irreparable harm unless an injunction issues.

### C. Balance of Hardships

■ Third, this Court must consider whether the injury to VAS outweighs the harm a preliminary injunction may cause to Arroyo. Arroyo argues that a prelimi-

nary injunction would harm him because he would have to disclose on future employment applications that a temporary restraining order was once issued against him (*see* DE 21 at 20). Due to Arroyo's alleged misappropriation of VAS's trade secrets, VAS faces potentially irreparable injury in the form of lost customers, goodwill, and misappropriated trade secrets.

Based on these considerations, the threatened injury to VAS significantly outweighs the harm a narrowly tailored preliminary injunction might cause Arroyo. Moreover, Arroyo's refusal to return these documents to VAS after VAS demanded them forced VAS to turn to this Court for relief.

### D. Public Interest

■ Finally, this Court must address whether an injunction, if issued, will disserve the public interest. Arroyo argues public policy would be disserved by issuing a temporary restraining order because he did not wrongfully take any of VAS's documents and because "this action is nothing more than an attempt by VAS ... to prevent and/or make it difficult for Defendant to have a successful career at another company." (DE 21 at 21).

The facts do not support Arroyo's argument, and, a preliminary injunction would affirmatively serve the public interest by protecting businesses from employees who misappropriate their trade secrets. Additionally, due to the nature of VAS's contracts with Boeing and other aerospace companies, the public is served by forcing Arroyo to return documents which contain specifications of aircraft that are converted to military use.

### III. INJUNCTION BOND

Federal Rule of Civil Procedure 65(c) provides that no preliminary injunction

"shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined...." FED.R.CIV.P. 65(c).

■ "The 'burden is on the party seeking security to establish a rational basis for the amount of a proposed bond,'" *Cont'l Group, Inc. v. KW Prop. Mgmt., LLC,* 2009 WL 3644475, at *6 (S.D.Fla. Oct. 30, 2009), and the amount of an injunction bond lies within the sound discretion of this Court. *Carillon Imps., Ltd. v. Frank Pesce Intern. Group Ltd.,* 112 F.3d 1125, 1127 (11th Cir.1997). In this case, I will require VAS to post a security bond of $25,000.00 for the duration of the preliminary injunction.

## IV. CONCLUSION

Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Plaintiff's Motion for Temporary Restraining Order and for Preliminary Injunction (DE 4) is **GRANTED.**

Further, it is hereby

**ORDERED AND ADJUDGED** that:

1. Defendant shall immediately produce to Plaintiff's counsel any and all thumb drives in his care, control, or custody that contain or contained VAS information;

2. Defendant shall immediately produce to Plaintiff's counsel the boxes, including all their contents, which he removed from the Kent Facility on March 17, 2012.

3. Defendant shall immediately produce to Plaintiff's counsel any and all hard copies of VAS information that he removed during the course of his employment;

4. Defendant shall immediately send to his counsel any computer in his care, custody, or control on which he accessed or saved VAS Information; and

5. If Defendant does not possess any of the aforementioned information, he must submit to the Court an Affidavit within ten (10) days detailing what happened to the information.

**DONE AND ORDERED.**